**MAGNANIMO DEAN LAW, APC**
LAUREN A. DEAN (SBN 174722)
Email: Lauren@MagDeanLaw.com
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Telephone: (818) 305-3450
Facsimile: (818) 305-3451

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
Email: tjmckenna@gme-law.com
GREGORY M. EGLESTON
Email: gegleston@gme-law.com
501 Fifth Avenue, 19th Floor
NY, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN LINDSEY, Derivatively on Behalf of MOMENTUS, INC. (F/K/A STABLE ROAD ACQUISITION CORP.), <br><br> Plaintiff, <br><br> vs. <br><br> CHRIS HADFIELD, BRIAN KABOT, MITCHEL B. KUGLER, VICTORINO MERCADO, KIMBERLY A. REED, LINDA J. REINERS, AND JOHN C. ROOD, <br><br> Defendants, <br><br> -and- <br><br> MOMENTUS, INC. (F/K/A STABLE ROAD ACQUISITION CORP.) <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Brian Lindsey, by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Momentus, Inc. ("Momentus" or "Company") (f/k/a Stable Road Acquisition Corp.) ("SRAC")), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Momentus with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.   This is a shareholder derivative action brought in the right, and for the benefit, of Momentus.

2.   SRAC, Momentus, and their directors and officers, misled investors regarding Momentus's business and future prospects in an attempt to gain investor support for a proposed merger between SRAC, mom a special purpose acquisition company (or "SPAC") focused on the cannabis industry, and Momentus, a privately owned space industry startup with no revenue.[1]

---

[1]   On August 12, 2021, SRAC consummated a merger contemplated by the Agreement and Plan of Merger, dated as of October 7, 2020, as amended (the "Merger Agreement"), by and among SRAC, Project Marvel First Merger Sub, Inc., a Delaware corporation and a direct, wholly-owned subsidiary of SRAC ("First Merger Sub"), Project Marvel Second Merger Sub, LLC, a Delaware limited liability company and a direct, wholly-owned subsidiary of SRAC ("Second Merger Sub"), and the Delaware corporation that was formerly known as Momentus Inc. ("Legacy Momentus"). Pursuant to the terms of the Merger Agreement, First Merger Sub merged with and into Legacy Momentus (the "First Merger"), with Legacy Momentus being the surviving corporation of the First Merger, immediately followed by the surviving corporation merging with and into Second Merger Sub (the "Second Merger" and, collectively with the First Merger and the other transactions contemplated by the Merger Agreement, the "Business Combination"), with Second Merger Sub continuing as the surviving entity as a wholly owned subsidiary of SRAC under the name Momentus Space LLC. On the closing date, and in connection with the closing of the business combination, SRAC changed its name to Momentus.

3.      SRAC tried to locate a cannabis/marijuana related company to acquire as was its stated purpose but they were unable to locate one prior to the May 13, 2021 deadline upon which SRAC would need to repay $172.5 million to shareholders if no successful merger was consummated.  In order to prevent this return of money and to enrich Defendants (defined below), who would make tens of millions of dollars from the merger, SRAC entered into the merger with Momentus. To make sure that shareholders approved this last-minute deal, Defendants misleadingly touted the proposed merger and Momentus's prospects.

4.      This was confirmed by the SEC itself when on July 13, 2021, the SEC publicly detailed the defendants' misconduct in: (a) a cease and desist order against Momentus, SRAC, SRCNI Holdings LLC (the "Sponsor" of SRAC) and Brian Kabot (SRAC's CEO); and (b) a civil filed against Kokorich.  According to the SEC Order and SEC Complaint, the defendants had misleadingly promoted the proposed merger and Momentus's prospects while failing to disclose that (i) multiple federal agencies had determined that Momentus's then-CEO Defendant Kokorich, who is a citizen of Russia with ties to the Russian government and who is not a citizen or legal permanent resident of the United States, posed an unacceptable national security risk, (ii) Momentus had never successfully tested its technology in space as claimed, (iii) as a result, Momentus's financial projections of immediate, explosive revenue growth were highly misleading, and (iv) SRAC's superficial due diligence of Momentus failed to provide any reasonable basis for its public statements about the company. Moreover, the SEC Order and Complaint explained that Momentus, SRAC, and Kabot agreed to pay the SEC fines totaling over $8 million, the Sponsor agreed to give up SRAC stock potentially worth millions of dollars, and Defendants agreed to allow certain investors to cancel agreements to purchase SRAC securities.

5.      In a July 13, 2021 press release announcing the SEC Order and the SEC Complaint, SEC Chair Gary Gensler confirmed that the defendants "misled the investing public" and that SRAC had "fail[ed] to undertake adequate due diligence to protect

shareholders."  Gensler stated:

> This case illustrates risks inherent to SPAC transactions, as those who stand to earn significant profits from a SPAC merger may conduct inadequate due diligence and mislead investors . . . Stable Road, a SPAC, and its merger target, Momentus, both misled the investing public. The fact that Momentus lied to Stable Road does not absolve Stable Road of its failure to undertake adequate due diligence to protect shareholders. Today's actions will prevent the wrongdoers from benefitting at the expense of investors and help to better align the incentives of parties to a SPAC transaction with those of investors relying on truthful information to make investment decisions.

## **JURISDICTION**

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the securities class actions entitled *In re Stable Road Acquisition Corp. Securities Litigation*, Master File No. 2:21-CV-5744-JFW(SHKx) (C.D. Cal.) (the "Securities Class Action") based on violations of the Exchange Act.

7.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

8.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

9.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.  In addition, the Company's principal executive offices are in this District.

## **THE PARTIES**

### **Plaintiff**

10.     Plaintiff is, and was at relevant times, a shareholder of Stable Road, which

is now Momentus.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.    Plaintiff currently holds Momentus shares as of the filing of this Complaint.

**Defendant SRAC**

11.    Defendant SRAC was a special purpose acquisition company.  SRAC was incorporated in Delaware.  SRAC maintained its principal executive offices at 1345 Abbot Kinney Blvd. Venice, California 90291.

12.    *Defendant Juan Manuel Quiroga* ("Quiroga") served as Chief Investment Officer and Secretary of SRAC.  Defendant Quiroga was a manager of the Sponsor, shared voting and dispositive control over securities owned by the Sponsor and was reported as beneficially owning securities owned by the Sponsor.  Defendant Quiroga's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

13.    *Defendant James Norris* ("Norris") served as Chief Financial Officer ("CFO") and a director of SRAC.  Defendant Norris was directly or indirectly a member of the Sponsor.  Defendant Norris's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

14.    *Defendant James Hofmockel* ("Hofmockel") served as a director of SRAC.  Defendant Hofmockel was directly or indirectly a member of the Sponsor.  Defendant Hofmockel's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

15.    Defendants Quiroga, Norris, Hofmockel and Kabot (*see* below) are referred to herein as the "SRAC Individual Defendants."

**Nominal Defendant Momentus**

16.    Nominal Defendant Momentus was a privately owned space industry startup that was an acquisition target of SRAC.  Momentus's principal executive offices were located at 3050 Kenneth St., Santa Clara, California 95054.

**Momentus Board of Directors**

17.   **Defendant Mikhail Kokorich** ("Kokorich") served as CEO and a director of Momentus, until his resignation effective immediately on or about January 25, 2021. Defendant Kokorich was a major shareholder of Momentus until he sold his shares to Momentus on or about June 8, 2021.  Defendant Kokorich's business address was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

18.   **Defendant Brian Kabot** ("Kabot") served as CEO and Chairman of the board of directors of SRAC.  Defendant Kabot was a manager of the Sponsor, shared voting and dispositive control over securities owned by the Sponsor and was reported as beneficially owning securities owned by the Sponsor.  Defendant Kabot is also a member of the Board of Momentus and is the Chairperson of the Audit Committee. Defendant Kabot's business address was c/o Stable Road Acquisition Corp., 1345 Abbot Kinney Blvd. Venice, California 90291.

19.   **Defendant Dawn Harms** ("Harms") served as Chief Revenue Officer of Momentus, until Defendant Kokorich's resignation effective immediately on or about January 25, 2021, at which time Defendant Harms became interim CEO and a director of Momentus.   Defendant Harms's business address was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

20.   **Defendant Fred Kennedy** ("Kennedy") served as President of Momentus. Defendant Kennedy's business address was c/o Momentus Inc., 3050 Kenneth Street, Santa Clara, CA 95054.

21.   **Defendant Chris Hadfield** ("Hadfield") is a member of the Board. Defendant Hadfield is also a member of the Compensation Committee, Disclosure Committee and Nominating and Corporate Governance Committee.

22.   **Defendant Mitchel B. Kugler** ("Kugler") is a member of the Board. Defendant Kugler is also the Chairperson of the Compensation Committee, and a member of the Disclosure Committee and the Nominating and Corporate Governance Committee.  Defendant Kugler is also a member of the Audit Committee.

23.   **Defendant Victorino Mercado** ("Mercado") is a member of the Board.

Defendant Mercado is the Chairperson of the Nominating and Corporate Governance Committee and the Security Committee.

24. **Defendant Kimberly A. Reed** ("Reed") is a member of the Board. Defendant Reed is a member of the Audit Committee and the Nominating and Corporate Governance Committee.

25. **Defendant Linda J. Reiners** ("Reiners") is a member of the Board. Defendant Reiners is the Chairperson of the Audit Committee.

26. **Defendant John C. Rood** ("Rood") is the CEO of the Company and Chair of its Board. Defendant Rood is a member of the Disclosure Committee.

27. Defendants Kokorich, Kabot, Harms. Kenndey, Hadfield, Kugler, Mercado, Reed, Reiners and Rood are collectively referred to hereinafter as the "Momentus Individual Defendants."

28. The SRAC Individual Defendants and the Momentus Individual Defendants are collectively referred to herein as "Defendants".

29. Defendants Kabot, Hadfield, Kugler, Mercado, Reed, Reiners and Rood are collectively referred to herein as the "Director Defendants".

## CODE OF BUSINESS CONDUCT AND ETHICS

30. Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

31. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE DIRECTOR DEFENDANTS

32. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company,

Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

33. Defendants owe to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

34. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the

Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

35.     Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

36.     Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.

### MOMENTUS'S AUDIT COMMITTEE CHARTER

37.     Momentus's Audit Committee Charter states in relevant part:

**Responsibilities**

In addition to such other responsibilities as may be delegated to the Committee from time-to-time by the Board, the Committee shall:

3.1.         Review on a continuing basis the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

3.2.         Pre-approve all audit and permissible non-audit services and related engagement fees and terms for services provided to the Company by the independent auditors (or subsequently approving non-audit services in those circumstances where a subsequent approval is necessary and permissible);

3.3.         Review and provide guidance with respect to the external audit and the Company's relationship with its independent auditors by: (i) reviewing the independent auditors' proposed audit scope, approach and independence; (ii) obtaining on a periodic basis in accordance with applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") a written statement from the independent auditors regarding relationships and services with the Company which may impact independence or objectivity, and to the extent there are relationships, monitoring and investigating such relationships, including actively engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and presenting such information to the Board; (iii) receiving and reviewing a report by the independent auditors describing any material issues raised by the most recent internal quality control review, or peer review, of the independent auditing firm, or by any inquiry or investigation by governmental or professional authorities and any steps taken to deal with any such issues; (iv) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, critical audit matters addressed during the audit, significant new accounting policies, any alternative treatments of financial information within GAAP that the independent auditor has discussed with management, ramifications of the use of these alternative disclosures and

the treatment preferred by the independent auditor and disagreements with management and any other matters required to be discussed by applicable accounting standards; and (v) reviewing reports submitted to the Committee by the independent auditors in accordance with the applicable SEC requirements and other legal or regulatory requirements;

3.4    Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by the PCAOB and the SEC, and (3) with the independent auditor concerning the independent auditor's independence;

3.5    Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

3.6    Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10Q, using professional standards and procedures for conducting such reviews;

3.7.    Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

3.8.    Review before release the unaudited quarterly or annual operating results (or financial outlook or guidance) to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

3.9.    Review the contents of the officer certifications to be filed with the SEC pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act and the process conducted to support the certifications;

3.10.    Consider the establishment, and oversee the activities, of any

internal audit function within the Company;

3.11. Review any reports by management or internal auditors, if any, regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and review before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and, if applicable, the attestations or reports by the independent auditors relating to such disclosure;

3.12. Oversee compliance with legal requirements for disclosure of the Company's independent auditor's services and Committee members, member qualifications and activities;

3.13. Periodically review the Company's code of business conduct and ethics and approve any amendments thereto or waivers thereof, and perform those functions delegated to the Committee set forth in the Company's code of business conduct and ethics;

3.14. Review, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

3.15. Provide oversight and review at least annually of the Company's financial risk management policies, including its investment policies;

3.16. If necessary, institute special investigations with full access to all books, records, facilities and personnel of the Company;

3.17. As appropriate, engage and obtain advice and assistance from outside legal, accounting or other advisors with funding to be provided by the Company;

3.18. Conduct appropriate review and oversight of related party transactions, as defined by applicable rules of the SEC and Nasdaq Stock Market;

3.19. Review and assess the adequacy of this Charter and recommending any proposed changes to the Board for approval, on an annual basis;

3.20.     Review annually its own performance against the responsibilities outlined in this Charter and as otherwise established by the Board;

3.21.     Provide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

3.22.     Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

3.23.     Review and discuss with management, the independent auditor and the internal auditor, if any, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, except as to those risks for which oversight has been assigned to other committees of the Board or retained by the Board;

3.23.     Review the adequacy and effectiveness of the Company's information and cyber security policies and the internal controls regarding information and cyber security
and

3.24.     Review with management and members of internal audit, if any, the Company's business continuity and disaster preparedness planning.

3.25.     Oversee the implementation of the terms of the settled Securities and Exchange Commission's Order issued to the Company on July 13, 2021.

**Background of SRAC**

38.     SRAC was a special-purpose acquisition company, which was incorporated on May 28, 2019 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

39.     SRAC filed its IPO prospectus with the SEC on November 8, 2019.  On or

about November 13, 2019, SRAC completed its IPO, selling 17,250,000 units at $10.00 per unit and generating gross proceeds of $172.5 million.  Following its IPO, SRAC's public units, Class A common stock and public warrants were publicly traded on the Nasdaq Capital Market under the ticker symbols "SRACU," "SRAC" and "SRACW," respectively.

40.     During the IPO and afterwards, the directors and officers of SRAC, who also controlled the Sponsor, held themselves out to investors as highly experienced businesspeople, with successful track records in acquiring and growing businesses.  In particular, the directors and officers of SRAC held themselves out to investors as highly experienced in the cannabis industry, which they repeatedly stated would be SRAC's focus for completing an acquisition.

41.     From SRAC's IPO, SRAC had only three officers: Defendants Kabot, Norris, and Quiroga.  Apart from these three officers, SRAC had no employees.

42.     At the time of its IPO SRAC had five directors: Kabot (Chairman), Defendant Norris, Defendant Hofmockel, March Lehmann, and Kellen O'Keefe.  On December 23, 2019. Ann Kono joined SRAC's board.  SRAC's board consisted of these six members, apart from the resignation of O'Keefe effective immediately on March 24, 2021.

43.     SRAC was led by Defendant Kabot, who served as SRAC's CEO and Chairman since its inception.  In the IPO Prospectus, SRAC repeatedly touted Kabot's investment experience, and his investment experience in the cannabis industry. For instance, SRAC stated: "Mr. Kabot is well qualified to serve as a director due to his extensive investing and advisory experience in the cannabis industry."

44.     The IPO Prospectus did not disclose, for any of its directors or officers, any experience with satellites, the space industry, engineering, national security regulations, or any related matters.  SRAC's directors and officers had no meaningful experience in these subjects.

45.     In its IPO Prospectus, SRAC repeatedly emphasized that its business

strategy and source of competitive advantage would be a focus on the cannabis industry. For instance, SRAC stated: "[o]ur strategy is to pursue one or more business combinations with companies servicing and operating adjacent or ancillary to, the cannabis sector but which are not directly involved in the production, distribution and sale of cannabis (*i.e.* businesses that 'touch the plant')." SRAC also stated: "[w]hile we may pursue an initial business combination target in any business or industry, we intend to focus our search on companies in the cannabis industry."

46.   SRAC assured investors that it believed its management team "is well positioned to identify and evaluate businesses within the cannabis sector that would benefit from their skills and access to the public markets," and that its management team offers "a deep network of contacts, in the cannabis sector." SRAC also stated that "Mr. Kabot and Mr. Quiroga have, in the aggregate, executed over 20 transactions within or ancillary to the cannabis sector and have been responsible for investing over $150 million within or ancillary to the cannabis sector since July 2017."

47.   The IPO Prospectus mentions "cannabis" 281 times, but contains no references to satellites, the space industry, engineering, national security regulations, or any related matters.

48.   SRAC's intense focus on the cannabis industry continued beyond its IPO. For instance, in its SEC Form 10-K annual report filed March 26, 2020, SRAC repeated many of its IPO Prospectus statements regarding the cannabis experience of its management and its focus on the cannabis industry. SRAC stated: "[o]ur strategy is to pursue one or more business combinations with companies servicing and operating adjacent or ancillary to, the cannabis sector but which are not directly involved in the production, distribution and sale of cannabis (*i.e.*, businesses that 'touch the plant')." SRAC's SEC Form 10-Q quarterly report filed August 11, 2020 likewise repeated that "[a]lthough the Company is not limited to a particular industry or sector for purposes of consummating a Business Combination, the Company is focusing its search on companies in the cannabis industry."

49.     SRAC's other SEC filings subsequent to the IPO and prior to its October 7, 2020 announcement of the Momentus merger agreement similarly contain numerous references to cannabis, but no references to satellites, the space industry, engineering, national security regulations, or any related matters.

**SRAC's Business Combination By The May 13, 2021 Deadline**

50.     Due to the SRAC Individual Defendants' ownership interests in SRAC and the terms and financial structure of SRAC as a SPAC, the SRAC Individual Defendants possessed strong financial incentives to complete a qualifying transaction by the May 13, 2021 deadline.  The SRAC Individual Defendants faced pressure to complete a transaction irrespective of the merits of that transaction for SRAC's public shareholders.

51.     SRAC was subject to certain restrictions in its amended and restated certificate of incorporation regarding its pursuit of an acquisition.  First, SRAC only had 18 months to complete a business combination from the closing date of the IPO.  If SRAC did not complete a business combination in time (*i.e.*, by May 13, 2021) or obtain postponement of this deadline, its corporate existence would cease, except for purposes of winding up its affairs and liquidating.  SRAC was required to hold the approximately $172.5 million of net proceeds from its IPO in a trust account, and these funds were to be released only upon the consummation of a qualifying business combination, or in the case of liquidation to return the funds to SRAC's investors.

52.     Second, if SRAC's stockholders approved an amendment to the amended and restated certificate of incorporation that would affect the substance or timing of SRAC's obligation to redeem 100% of the public shares if SRAC did not complete a business combination on time, SRAC was required to provide the holders of its public shares with the opportunity to redeem all or a portion of their public shares upon approval of any such amendment. Attempting to obtain such a postponement of its deadline for a business combination thus presented serious risks that (i) shareholders would not approve the postponement and so SRAC would be forced to liquidate if it

failed to complete a transaction on time, or (ii) if a postponement was approved, shareholders may decide to redeem SRAC shares in amounts that would significantly deplete SRAC's $172.5 million trust account and jeopardize its ability to complete a transaction even with an extended deadline.

53. The directors and officers of SRAC acquired a significant financial interest in SRAC prior to the IPO, through their interests in and control over SRAC's Sponsor. Each of SRAC's officers and directors was, directly or indirectly, a member of the Sponsor. The Sponsor's board of managers was comprised of Edward K. Freedman, Defendant Kabot and Defendant Quiroga. SRAC reported each of Freedman, Kabot, and Quiroga as beneficially owning the securities owned by the Sponsor and reported that these individuals shared voting and dispositive control over such securities.

**Momentus**

54. Momentus was founded in 2017 in Santa Clara, California, by cofounders Defendant Kokorich and Lev Khasis. Kokorich served as Momentus's CEO from November 2017 until his abrupt resignation on January 25, 2021. At the time of the October 7, 2020 merger agreement announcement by SRAC and Momentus, among Momentus's largest beneficial owners were Defendant Kokorich and Olga Khasis, the spouse of cofounder Lev Khasis. At the time of the October 7, 2020 merger agreement announcement, key members of the Momentus management team included Defendant Kokorich, Defendant Harms, then serving as Momentus's Chief Revenue Officer, and Defendant Kennedy, Momentus's President.

55. The joint press release from Momentus and SRAC announcing their merger agreement on October 7, 2020, described Momentus as "a commercial space company offering in-space transportation and infrastructure services." SRAC and Momentus claimed that "Momentus is developing capabilities to provide critical infrastructure services: in-space transportation, satellite as a service, and in-orbit services." They further claimed that "Momentus' customers include satellite operators, satellite manufacturers, launch providers, defense primes such as Lockheed Martin and

government agencies such as NASA."

56.   At no time have Momentus's operations had any connection to the cannabis industry.

**Momentus Conceals Problems That Might Prevent A Merger With SRAC**

57.   Since its founding in 2017, Momentus had been regularly incurring losses. Momentus recorded net losses of $6.2 million for 2018, $15.8 million for 2019, and $15.4 million for just the six months ended June 30, 2020.

58.   Momentus was dependent for its continued existence on raising funds from investors. At the time of the October 2020 merger announcement, Momentus had already raised, and spent, tens of millions of dollars of investor capital.

59.   In May 2020, Momentus received a $970,000 loan under the federal government's Paycheck Protection Program, which required it to certify that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

60.   As of June 30, 2020, Momentus's total liabilities were greater than its total assets.  As of June 30, 2020, Momentus had $10.7 million in cash on hand, which would not even be enough to continue its operations through the end of the year based on the rate of its losses in the first half of 2020.

61.   The Momentus Individual Defendants had a strong incentive to conceal any problems that might prevent Momentus from completing a merger with SRAC and gaining access to its badly needed cash.

## UNDISCLOSED FACTS KNOWN TO DEFENDANTS

**Momentus'sRussian CEO Was A National Security Risk**

62.   Momentus and the Momentus Individual Defendants knew, but failed to disclose, that the U.S. government had determined that Momentus's CEO Defendant Kokorich presented a national security risk, which posed serious problems for Momentus and created a heightened risk that Momentus would not be granted regulatory

approvals necessary for its operations.

63.     Kokorich is a citizen of Russia.  At no time has he been a citizen or legal permanent resident of the United States.

64.     Kokorich co-founded Momentus with Lev Khasis, who from 2013 has been First Deputy Chairman of the Executive Board of Sberbank, which is the largest bank in Russia and which is owned by the Russian state.  Sberbank is subject to U.S. sanctions imposed by the U.S. Treasury Department Office of Foreign Assets Control in 2018 because Sberbank supported Russia's annexation of Crimea from Ukraine.  Sberbank has been led from 2007 by its CEO and Chairman Herman Gref, who is reported to be close to Russia's autocratic leader Vladimir Putin.  In a 2018 report to Congress, the Treasury Department named Gref on a list of "senior foreign political figures and oligarchs in the Russian Federation, as determined by their closeness to the Russian regime and their net worth."

65.     Prior to his founding of Momentus, Defendant Kokorich founded and led a company called Dauria Aerospace, which had offices near Moscow and in Mountain View, California.  Dauria Aerospace obtained contracts from the Russian state via the state-owned company Roscosmos State Corporation for Space Activities. Dauria Aerospace partnered with the Skolkovo Foundation, which purports to be a non-profit backed by the Russian state to support a scientific and technological center for the development and commercialization of advanced technologies.  According to a warning published by the FBI's Boston office in 2014, the Skolkovo Foundation "may be a means for the Russian government to access our nation's sensitive or classified research, development facilities and dual-use technologies with military and commercial applications."

66.     The parties to the SEC's litigation against Defendant Kokorich have filed various documents as exhibits in that litigation, which directly confirm Momentus's and Kokorich's knowledge of the U.S. government's national security concerns relating to Kokorich.

67.     On March 22, 2018, the U.S. Department of Commerce, Bureau of Industry and Security ("BIS") sent an Export License Rejection Notice to Momentus (which was at that time operating under the name Space Apprentices Enterprise). The Rejection Notice denied Momentus's application to provide to Defendant Kokorich "[t]echnology required for the use of electrothermal propulsion devices and thrusters," *i.e.*, the propulsion technology that formed the core of all of Momentus's planned services, and which Momentus advertised as its main competitive advantage. The Rejection Notice stated that the Department of Commerce had concluded that Kokorich "is not an acceptable recipient at this time of U.S.-origin items controlled for national security reasons."

68.     On June 24, 2018, an attorney for Defendant Kokorich wrote a letter to the U.S. Department of Treasury, Committee on Foreign Investment in the United States ("CFIUS") regarding Kokorich's ownership of stock in another space industry company, Astro Digital U.S., Inc. ("Astro Digital").  The letter was written to follow up on the attorney's recent phone conference with CFIUS personnel in the U.S. Departments of Treasury and Defense regarding the same subject matter.  Kokorich's attorney stated in the letter that "[d]uring the teleconference, CFIUS informed us that it is preparing to order the Kokoriches to divest their ownership interest in Astro Digital. According to your colleagues, CFIUS has concluded that the Kokoriches present a threat to the national security of the United States."  The letter further stated that Kokorich was "well versed in U.S. export control and sanctions laws and regulations."  According to the letter, CFIUS' investigation relating to national security concerns surrounding Defendant Kokorich had "now spanned almost two years," and prevented Astro Digital from being able to obtain new investment or funding. Defendant Kokorich's counsel listed Kokorich and his spouse as receiving copies of the letter.

69.     On November 12, 2020, Momentus received a notification from the Office of National Security and Technology Transfer Controls within the BIS, informing Momentus that the U.S. Department of Commerce intended to deny Momentus'

application for the deemed export of its "Vigoride" software and technology to Defendant Kokorich.  The notification stated that the Department of Commerce believed the denial "furthers the United States policy . . . to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States."  The notification further stated that the Department of Commerce made its determination in consultation with the Department of Defense, the Department of State, and the Department of Energy.

70.     The U.S. Department of Defense, Office of Foreign Investment Review sent a letter dated January 13, 2021 to the SEC concerning the proposed merger between SRAC and Momentus.  According to admissions later made in SRAC's SEC filings: "On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense . . . stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination."

71.     The January 13, 2021 letter stated that the Department of Defense "has concluded that Momentus presently poses a risk to national security and accordingly has requested appropriate governmental agencies conduct national security reviews" and that the Office of Foreign Investment Review would "continue to recommend that DoD places an indefinite hold on all Momentus' relationships with DoD."  The letter stated that Kokorich's previous Dauria Aerospace company partnered with the Skolkovo Foundation, which the FBI assessed "may be a means for the Russian government to access our nation's sensitive or classified research."  The letter also noted national security concerns relating to Momentus' "complex and opaque foreign ownership structure [that] may not accurately reflect the ultimate beneficial owner of Momentus nor the true identity of financiers of Momentus."  In particular, the letter noted that

reported major Momentus shareholder Olga Khasis was the wife of Lev Khasis, who was the "First Deputy Chairman of Russia's state-owned bank, Sberbank," and that Sberbank is on the Treasury Department Office of Foreign Assets Control's "Sanctions List."

72.    The Department of Defense's January 13, 2021 letter went on to state that it believed SRAC's November 2, 2020 S-4 filed with the SEC to be misleading regarding these and related national security issues, and that the "DoD is currently reviewing a 2019 federal investigation to determine if Mikhail Kokorich violated export control laws while serving as both an investor and executive in several satellite companies." The letter concludes by stating that the Defense Department "concluded that Momentus' current proposal poses a risk to investors," and by requesting that the SEC "delay the IPO of Momentus in order to provide DoD and other government agencies the appropriate time to conduct further due diligence."

73.    This Department of Defense letter appears to have prompted the SEC's investigation of Momentus, SRAC and the proposed merger. As SRAC admitted in later SEC filings, "[o]n January 24, 2021, [Momentus] received a subpoena from the Division of Enforcement of the U.S. Securities and Exchange Commission . . . requesting documents regarding the Registration Statement on Form S-4 and Amendment No. 1 thereto 1 . . . filed by SRAC in connection with the Business Combination." SRAC further admitted in other filings that "[i]n January 2021, the SEC's Division of Enforcement informed SRAC and Momentus that it was investigating certain disclosures made in filings with the SEC, including in connection with the Business Combination."

74.    In addition to the foregoing documents filed in the SEC's ongoing litigation against Defendant Kokorich, the SEC revealed additional details regarding Kokorich's national security risks and related problems in the SEC Complaint and the SEC Order. According to the SEC Order's findings and the SEC Complaint's allegations, in June 2018, U.S. Customs and Immigration Services ("USCIS") revoked Defendant Kokorich's work visa and denied his application for permanent resident status. In

September 2018, Kokorich applied for asylum, claiming to be a prominent critic of the Russian government.  On or about August 28, 2019, USCIS informed Kokorich that it had not granted his asylum application, and that it had referred his case to an immigration judge for adjudication in removal proceedings.  USCIS based its determination on "inconsistencies" in Kokorich's application and testimony "with regard to [his] political affiliations and activities in Russia."  On or about the same date, the FBI, the Department of Homeland Security, and the BIS's Office of Export Enforcement arrived unannounced at Momentus's headquarters, questioned multiple employees, and detained Kokorich and transported him to an immigration detention center after which he was released on bond.  Kokorich was in the process of adjudicating the removal proceedings when he left the U.S. in January 2021.

75.   The SEC Order and SEC Complaint also provide additional factual findings and allegations regarding the November 12, 2020 notification from the BIS informing Momentus that it intended to deny Momentus' application for the deemed export of its "Vigoride" software and technology to Defendant Kokorich.  Momentus had filed this application in February 2020, and on April 15, 2020, Momentus learned that the application was placed on "hold without action" by the BIS reviewer.

76.   On October 7, 2020, a BIS representative emailed Momentus stating that the Departments of Defense and State would recommend denying the application, and two days later the same BIS representative further disclosed that the Department of Energy would also recommend denial. On October 23, 2020, the BIS representative emailed again to disclose that BIS's Operating Committee had determined to deny the license.

77.   Momentus and the Momentus Individual Defendants failed to disclose to investors the foregoing highly material known facts, that multiple U.S. government agencies had repeatedly concluded that Defendant Kokorich was an unacceptable national security risk, which posed serious problems for Momentus's ability to carry out its planned operations in the space industry, which is very regulated and highly sensitive

1    from a national security standpoint.

2    **Momentus's Space Technology Was A Failure**

3    78.    Momentus and the Momentus Individual Defendants knew, but failed to

4 disclose, that Momentus had only conducted one test of its technology in space, that this

5 test was not completed due to an equipment failure, and that even if this test had been

6 successfully completed it would not have demonstrated the commercial viability of

7 Momentus's technology. As such, Momentus was highly unlikely to be able to develop

8 and commercialize its technology on the aggressive timeline touted by Defendants in

9 support of the merger.

10    79.    The critical piece of technology that Momentus touted as a breakthrough

11 and its key source of competitive advantage was the water plasma propulsion system

12 that was to be the source of power to provide Momentus's advertised services of

13 transporting satellites in space.  This water plasma thruster was of primary importance to

14 all of Momentus's plans and had to work in space in order for Momentus to generate any

15 revenue.

16    80.    Under pressure from the SEC to correct their prior misstatements,

17 Defendants admitted the severe shortcomings of the one and only in space test that

18 Momentus ever attempted of this technology:

> 19    Our first-generation X-band thruster, which operates at 30 Watts, was
> 20    flown aboard a demonstration mission called El Camino Real in mid- 2019.
> During this mission, Momentus launched its first MET [microwave
> 21    electrothermal thruster] into space as a hosted payload on a nanosatellite.
> The mission's objective was to demonstrate the MET's ability to produce
> 22    water plasma in space by performing 100 one-minute firings . . . Failure of
> 23    the host satellite in November 2019 prematurely terminated the
> demonstration after only 23 of the planned 100 firings of the thruster had
> 24    been performed . . .

25

26    81.    Momentus later confirmed the failure of this mission in a press release

27 reporting: "The MET water plasma-based thruster was launched in July 2019 in a

28 mission known as El Camino Real.  The mission did not meet its prelaunch success

criteria."

82.     Momentus and its personnel including Defendants Kokorich and Harms were immediately aware of the premature end of the test due to the equipment failure. This failure was discussed in a November 26-27, 2019 email chain among six Momentus employees including Defendants Harms and Kokorich, as well as Momentus's Chief Engineer, with the subject line: "Need El Camino Real Failure Review Board."  In that email chain, Momentus's Chief Technology Officer wrote,:"[e]ven if we recover the spacecraft, at this point it is my judgement that we need to convene a failure review board."

83.     Defendants' admissions detailed further shortcomings of this one and only in space test, stating that of the 23 firings completed before the mission's failure, there were "12 hot firings with microwave power turned on and 11 cold firings with the microwave turned off," and that "a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma-generation."

84.     Even for the three hot firings that had water present, Defendants admitted that "pressure and temperature data did not provide sufficient information to either confirm or contradict plasma presence." However, Defendants went on to state "Momentus believes that the reflected power data collected during the three hot firings with water present to be sufficient to conclude that plasma was produced."

85.     Defendants went on to admit "issue[s]" and "weaknesses" revealed by this test, reporting "[t]he aforementioned pump issue and other observed weaknesses from El Camino Real have informed our propulsion system design, pressure sensor selection and overall vehicle design process."

86.     In addition, Defendants admitted that the technology they planned to commercially deploy was not the small, commercially useless test model thruster involved in the 2019 in space test, but a redesigned version that was supposed to generate many times more thrust, that would be needed for any commercial operations. While the 2019 test model was supposed to operate at 30 Watts, Defendants admitted

that their planned commercial use thrusters were supposed to operate at powers of 550 Watts, 750 Watts, or more.  Defendants also admitted that "the technology underlying Momentus's anticipated service offerings (including its water plasma propulsion technology) is still in the process of being developed and has not been fully tested or validated in space."

87.     The SEC also revealed additional details regarding Momentus's failure to successfully test its technology in space in the SEC Complaint and the SEC Order. According to the SEC Order's findings and the SEC Complaint's allegations, a former Momentus officer stated that the thruster tested in the El Camino Real mission did not have"commercial potential" because it was "too small, too inefficient, too low in [specific impulse], too low in total impulse."  A former Momentus officer stated that the mission yielded "no data to suggest that that thruster would deliver an impulse of any commercial significance."  A Momentus engineer admitted that the mission did not yield sufficient data to demonstrate the propulsion system's reliability or longevity.  The SEC also revealed that while the satellite used in the El Camino Real test is still in space, it is not functional.

88.     The SEC Complaint and the SEC Order also confirm Defendant Kokorich's knowledge of these facts.  Defendant Kokorich admitted he understood even before the launch that the mission was not designed to show that the thruster could provide a measurable change in velocity from thrust, to measure specific impulse, or to show  the thruster's reliability.  In a February 2020 internal Momentus document sent to Defendant Kokorich, a Momentus engineer acknowledged that Momentus did not obtain "any useful mission results" from the launch.

89.     Momentus and the Momentus Individual Defendants failed to disclose to investors the foregoing highly material known facts, that Momentus's only test of its technology in space was not completed due to an equipment failure, and that even if this test had been successfully completed it would not have demonstrated the commercial viability of Momentus's technology.

**Momentus's Revenue Projections**

90.     Defendants repeatedly emphasized to public investors their aggressive revenue projections for Momentus.  For instance, Defendants' projections issued as part of the October 7, 2020 deal announcement forecast $2 million in 2020 revenue, $19 million in 2021, and $152 million in 2022, growing to over $4 billion by 2027.

91.     Because Momentus would only recognize revenue upon successfully providing its planned services in space, these forecasts were premised on the key assumptions that Momentus's technology would work as hoped in space, and that Momentus would be granted all of the many required regulatory approvals to conduct its operations and place its products on rocket launches.  As such, Defendants' near-term revenue forecasts likewise depended on the critical assumption that Momentus would be allowed to participate in one rocket launch in 2020, and three more in 2021.

92.     But Momentus and the Momentus Individual Defendants knew that the federal government had serious national security concerns relating to Defendant Kokorich which posed a high risk that Momentus would not receive regulatory approvals necessary to conduct its operations.  And Momentus and the Momentus Individual Defendants knew that it had never successfully demonstrated the commercial viability of its technology in space which posed a high risk that its technology would not perform as hoped on its first ever commercial missions.

93.     Momentus and the Momentus Individual Defendants knew of these serious risks to its planned operations and launch schedule, and likewise knew that their revenue projections ignored those risks and simply assumed that the federal government would grant Momentus all required regulatory approvals and that Momentus's technology would work in space as hoped.  Defendants knew that the best-case scenario assumptions they used in preparing Momentus's published financial projections were likely to fail, and that the aggressive revenue projections based on those assumptions were unlikely to be achieved.

**SRAC Lack of Due Diligence**

94.     SRAC and the SRAC Individual Defendants knew, but failed to disclose, that they had conducted inadequate due diligence of Momentus that failed to follow up on known red flags regarding Defendant Kokorich's national security issues, and that failed to investigate the results of Momentus's only test of its technology in space.

95.     SRAC and the SRAC Individual Defendants knew that they lacked sufficient information to assess the truth or falsity of their own statements regarding regulatory risks facing Momentus, or the purported success of Momentus's one and only in space test of its technology.  These Defendants knew that they lacked sufficient information to assess the truth or falsity of their own statements reiterating Momentus's aggressive revenue projections, because those projections were based on key assumptions that SRAC had never evaluated.

96.     Under pressure from the SEC to correct their prior misstatements, Defendants admitted facts showing that SRAC failed to reasonably investigate Momentus's claims regarding its technology.

97.     Defendants admitted that "none of the directors or officers of SRAC are engineers or physicists, and therefore their views as to the technical and commercial viability of Momentus' technology relied on the review and conclusions of experts that SRAC engaged as part of its due diligence review, as well as the representations of Momentus' senior management."

98.     Defendants admitted that their technical advisors' review did not evaluate Momentus's claims to have successfully tested its technology in space and was rushed to completion in only four weeks:

> On September 1, 2020, SRAC engaged Stellar Solutions, a technology consulting firm, to assist with technical due diligence.  Stellar Solutions' review, which resulted in a final report to SRAC in approximately four weeks, was designed to conduct an assessment encompassing technical capabilities, technical maturity, system and operational risks and concerns, as well as industry expert observations on market and competitive considerations for the services and business.  Stellar Solutions did not conduct a review of the results of the 2019 demonstration mission called El

Camino, based on its determination regarding the further development of the technology since that time and the additional ground testing that had been conducted by Momentus thereafter.

99.     Defendants admitted that members of the law firm, Kirkland & Ellis LLP, retained by SRAC in connection with the proposed merger and due diligence of Momentus, included investors in the Sponsor and its affiliate SRAC Pipe Partners LLC. SRAC's attorneys assisting with due diligence were not independent and objective, but shared the SRAC Individual Defendants' conflicts of interest based on their financial interests in the Sponsor.  According to SRAC's SEC filings, "[c]ertain partners of Kirkland & Ellis LLP are investors in the Sponsor and SRAC Partners."

100.    The SEC revealed additional details regarding the failure of SRAC and the SRAC Individual Defendants to conduct adequate due diligence of Momentus in the SEC Complaint and the SEC Order.

101.    The SEC Order found that SRAC did not specifically ask Stellar Solutions to review Momentus's El Camino Real mission, and Stellar Solution's report to SRAC made no mention of that mission.

102.    The SEC Order also found that SRAC and Defendant Kabot conducted inadequate due diligence relating to national security concerns surrounding Defendant Kokorich.  SRAC and Defendant Kabot knew that CFIUS had required Kokorich to divest form another space technology company in 2018.  During due diligence, SRAC received a copy of CFIUS's final order and repeatedly asked Momentus for correspondence and other documents that would describe the basis of the order. Momentus responded that it did not possess those documents.  SRAC failed to obtain a full and complete understanding of the basis for the CFIUS order or its impact on Momentus's business.

103.    SRAC and the SRAC Individual Defendants knew that they had failed to verify key information relating to Momentus's technology and Kokorich's national security risks, and that they were simply repeating to public investors unsupported

assertions made to them by Momentus and the Momentus Individual Defendants.

**Defendants Hype Momentus's Prospects**

104.   On October 7, 2020, SRAC and Momentus announced that they had entered into a merger agreement, pursuant to which the two companies would merge, SRAC stockholders would gain a proportionate interest in Momentus, Momentus would gain access to the $172.5 million in SRAC's trust account (plus additional funds from a concurrent private placement), and Momentus would become a publicly traded company. Defendants stated that completion of the proposed transaction was subject to approval by Momentus and SRAC shareholders and was expected to be completed in early 2021.

105.   On October 7, 2020, SRAC filed with the SEC a Form 8-K that contained further information about the proposed merger transaction. The Form 8-K included as attachments a copy of the joint press release from SRAC and Momentus, a copy of the merger agreement, and an investor presentation about Momentus and the proposed merger. On the same day, Defendants conducted a public conference call to discuss the proposed merger and to provide further information to investors, and Defendant Kabot gave a televised interview on *CNBC*. Through these various channels, Defendants aggressively promoted the proposed merger and Momentus's prospects.

106.   Defendants' October 7, 2020 statements were materially false and/or misleading, and failed to disclose material adverse facts about the Momentus's business, operations, and prospects. Defendants failed to disclose to investors that: (i) the federal government had determined Momentus's CEO, Defendant Kokorich, to be a threat to national security, (ii) Momentus had never successfully tested its technology in space, (iii) as a result, Defendants' projections of Momentus's future revenue were wildly overstated, and (iv) SRAC's due diligence of Momentus was superficial, ignored red flags that demanded further investigation, and did not provide a reasonable basis for SRAC's statements about Momentus.

107.    Nowhere in Defendants' October 7, 2020 statements did they mention that the federal government had raised national security concerns regarding Momentus's co-founder, major shareholder and CEO Defendant Kokorich, which had caused the U.S. Department of Commerce Bureau of Industry and Security to deny Momentus an export license, and which had caused the U.S. Treasury Department Committee on Foreign Investment in the United States to order Kokorich to divest his ownership interests in another space industry company he had led.

108.    In the press release announcing the Merger Agreement, SRAC and Momentus stated that: "[i]n 2019, the Company successfully tested its water plasma propulsion technology in space." However, the mission referred to failed before achieving its objectives, and did not even attempt to demonstrate the commercial viability of Momentus's technology.

109.    Defendants ignored the substantial risks to Momentus's business posed by these national security concerns and the unproven status of its technology, and baselessly forecast revenues of $2 million in 2020, $19 million in 2021, increasing to over $1 billion by 2024, and over $4 billion by 2027, despite never having earned any revenue in the company's history to date.

110.    And when Defendant Kabot went on television, in response to a question regarding the current "blank check bonanza," and "whether you think there's just too many" SPACs, he stated:

> what I think is great for the investor is we did four months of due diligence. We spent a lot of money with some of the top service providers out there from Stellar Solutions to Kirkland and Ellis, from Orrick to Evercore to cantor completing our underwriting, right, we did four months of due diligence, which in a traditional ipo you would never have the opportunity to do, so I think SPACs are very healthy for the market.

111.    Defendant Kabot made these statements despite knowing that SRAC had failed to undertake basic due diligence such as confirming whether Momentus's technology was actually successfully tested in space or following up on red flags known

to SRAC about national security issues relating to Defendant Kokorich.

**Defendants Promoted The Proposed Merger**

112.   From Defendants' first public announcement of the proposed Merger on October 7, 2020 up to the SEC's July 13, 2021 announcement of the SEC Order and the filing of the SEC Complaint, Defendants misleadingly promoted the proposed Merger and Momentus's business prospects in numerous public statements.

113.   Defendants falsely ignored and downplayed the U.S. government's national security concerns relating to Defendant Kokorich.  Defendants falsely told investors that Momentus had successfully tested its technology in space.  Defendants ignored national security and technological risks to baselessly claim that Momentus could achieve explosive revenue growth, beginning in only a matter of months. And Defendants falsely boasted of SRAC's purportedly "extensive" due diligence of Momentus.

114.   SRAC filed with the SEC a Registration Statement on Form S-4 on November 2, 2020, which, similar to Defendants' October 7, 2020 statements, contained false and misleading statements and omissions regarding Momentus, SRAC's due diligence, and the proposed merger.

115.   While SRAC's November 2, 2020 Registration Statement (and later amendments) recited certain potential risks that could arise in connection with the merger with Momentus, it provided no reasons to suspect that SRAC had failed to reasonably investigate such risks, or any indication that any of these potential risks had already substantially materialized. In short, SRAC's shareholders had no reason to doubt the Defendants' characterization of Momentus as a valuable business with a clear path to rapid and substantial revenue growth and profitability.

116.   SRAC subsequently amended the Registration Statement four times: December 14, 2020; March 8, 2021; June 29, 2021; and July 12, 2021. While certain of these amendments provided additional information regarding Momentus's national security problems, Momentus's failure to successfully test its technology in space,

Momentus's financial projections, or SRAC's due diligence, each amended Registration Statement still omitted material information and failed to disclose sufficient information to fully reveal the truth to investors.

117.    SRAC also filed with the SEC updated versions of the investor presentation relating to Momentus that had been initially filed on October 7, 2020. SRAC filed such updated investor presentations, each of which remained materially misleading for the above stated reasons, on October 13, 2020; November 17, 2020; December 14, 2020; April 7, 2021; and May 5, 2021.

118.    Momentus issued a dozen promotional press releases, which touted Momentus's business and/or promoted the proposed Merger, for example by announcing customer "contracts" to deliver satellites to lunar orbits which Momentus had never attempted and lacked the technology to achieve.

119.    Defendants gave interviews to public media outlets to misleadingly promote the proposed merger.  For example, on January 4, 2021, simultaneously with Defendants' announcement that Momentus's launch schedule would be delayed in order to obtain regulatory approvals, Defendant Kennedy gave an interview to IPO Edge in which he misleadingly reaffirmed Momentus's revenue projections and downplayed national security concerns relating to Defendant Kokorich. And on May 4, 2021, Defendants Kabot and Harms, along with Momentus Chief Technology Officer Rob Schwartz, gave another interview to IPO Edge, in which they continued to misleadingly tout Momentus's prospects and technology.

## **THE TRUTH EMERGES**

120.    From January 4, 2021 until July 13, 2021, the truth regarding SRAC and Momentus was revealed to investors in a series of partial corrective disclosures and materializations of previously concealed risks. Over this period, Momentus and SRAC made several piecemeal partial disclosures of regulators' national security concerns relating to Momentus, resulting in the repeated postponement of its planned space missions, the resignation of Defendant Kokorich, and customers and suppliers

abandoning Momentus. Over this period, Momentus and SRAC similarly made piecemeal partial disclosures relating to and as a result of the SEC's investigation into their misleading statements to investors, culminating in the SEC's announcement of the Cease and Desist Order and the filing of a civil enforcement action against Defendant Kokorich on July 13, 2021.

121. In response to SRAC's and Momentus's partial corrective disclosures and materializations of concealed risks over the January 4, 2021 to July 13, 2021 period, and ultimately in response to the SEC's revelations, SRAC's publicly traded stock price declined dramatically.

**January 4, 2021 Disclosures Concerning Launch Delay**

122. On January 4, 2021, after the close of stock market trading, Momentus published a press release titled "Momentus Announces Move of Vigoride from January 2021 Mission; Will be Remanifesting to a Subsequent Launch," and SRAC publicly filed a copy of the press release with the SEC.

123. The press release stated in relevant part that Momentus "will be remanifesting its January 2021 mission to a subsequent launch opportunity in 2021. This move will allow for the additional time necessary to secure FAA approval of Momentus' payloads, including completion of a standard interagency review."

124. From the October 7, 2020 deal announcement onward, Defendants had repeatedly touted a planned December 2020 or January 2021 mission to place customer satellites in space and test Momentus's technology in space. However, as partially revealed by the January 4, 2021 press release, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had begun to materialize, with a federal government agency denying an approval without which Momentus could not operate its business, and with the announcement of an ongoing "interagency review."

125. Following publication of this press release, on January 5, 2021 SRAC's stock closed at $16.25 per share, 6.0% lower as compared to its previous day closing

price. SRAC's stock continued to fall in the next trading session, closing January 6, 2021 at a price of $15.40 per share, representing a total loss of 10.9% since publication of the press release.

**January 25, 2021 Disclosures Concerning Kokorich's Resignation**

126.   On January 25, 2021 before the open of stock market trading, Momentus published a press release titled "Momentus Names Dawn Harms Interim CEO," and SRAC publicly filed a copy of the press release with the SEC.

127.   The press release disclosed that Defendant Kokorich had resigned effective immediately, and would be replaced by Defendant Harms as interim CEO.  The press release stated in relevant part, "Momentus, in consultation with . . . Stable Road . . . has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign ownership concerns surrounding the Company, the existence of which the Company recently has confirmed."  The press release quoted Defendant Kabot as stating, "We believe that this leadership transition will position the company for success and help accelerate regulatory reviews by the U.S. government." The press release stated that "Momentus and Stable Road are fully committed to cooperating with the U.S. government in connection with any regulatory reviews."

128.   From the October 7, 2020 deal announcement onward, Defendants had touted Defendant Kokorich's central importance to Momentus and its future plans. However, as partially revealed by the January 25, 2021 press release, the federal government had "national security and foreign ownership concerns" relating to Momentus. Also as partially revealed by the January 25 press release, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had further materialized, to the point that Momentus's CEO and co-founder was forced to resign, amid ongoing "regulatory reviews by the U.S. government."

129.   Following publication of this press release, on January 25, 2021 SRAC's stock closed at $23.68 per share, 4.7% lower as compared to its previous day closing

price. SRAC's stock continued to fall in the next trading session, closing January 26, 2021 at a price of $22.75 per share. And SRAC's stock continued to fall in the following trading session, closing January 27, 2021 at a price of $20.10 per share, representing a total loss of 19.1% since publication of the press release.

**March 8, 2021 Disclosures Concerning Governmental Investigations**

130.   On March 8, 2021, SRAC publicly filed with the SEC an amended Registration Statement on Form S-4/A.

131.   The amended Registration Statement contained partial corrective disclosures, and revealed the further materialization of concealed risks, relating to the federal government's national security concerns surrounding Defendant Kokorich.  For example, the amended Registration Statement disclosed that:

> On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense . . . stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination.

132.   The amended Registration Statement also revealed that "after a series of communications with the FAA with respect to a license for the January 2021 mission, the FAA ultimately determined that it was unable to grant to SpaceX an approval of the Momentus payload for the SpaceX Transporter-1 launch in January 2021 due to national security and foreign ownership concerns regarding Momentus raised by the Department of Defense during an interagency review."

133.   The amended Registration Statement further disclosed that Momentus had offered to undertake costly and time consuming "mitigation" efforts, that would adversely impact its business, in order to address the federal government's national security concerns:

> These proposed mitigation measures include, among other things, the

engagement of an independent professional to conduct an audit of Momentus' technology, adoption and implementation of a NSIT- or ISO-compliant data security plan, and appointment of a security officer to oversee compliance with mitigation terms agreed with CFIUS. Momentus and SRAC indicated in the CFIUS notice that the proposed mitigation measures are not intended to be exhaustive or exclusive, and that they are committed to wholly addressing CFIUS's and its member agencies' national security concerns.

134.   The amended Registration Statement revealed that Momentus now did not expect to complete its first launch until June 2021 and that Momentus generally expected a more delayed schedule for launches and commercialization of its technology as compared to its prior forecasts.

135.   The amended Registration Statement revealed that Momentus's backlog of customer contracts fell from $90 million to $86 million. This represented the cancellation of $4 million worth of customer contracts and was a further materialization of concealed risks relating to national security and SRAC's deficient due diligence, and the resulting significant delay in Momentus's planned launch schedule.  Also, the amended Registration Statement deleted a statement from the prior version of the Registration Statement, which had said "[w]e were recently selected by Lockheed Martin to support its $89.7 million contract from NASA's 2020 Tipping Point solicitation, to provide Satellite as a Service using our Vigoride vehicle for Lockheed Martin's payload," thus revealing that Lockheed Martin would no longer use Momentus for this mission.

136.   The notes to Momentus's financial statements included in the amended Registration Statement revealed that Momentus "has concluded there is substantial doubt about its ability to continue as a going concern within one year after the date these financial statements are issued," due to its history of losses, need to obtain additional investment, and uncertainty surrounding its products and services. The substantial doubt about Momentus's ability to continue as a going concern represented a further

materialization of risks relating to national security and SRAC's deficient due diligence concealed from investors, as delays in Momentus's launch schedule and ability to generate revenue were directly caused by the federal government's national security review of Kokorich and Momentus.

137.   The amended Registration Statement also revealed that "in January 2021, the SEC's Division of Enforcement informed SRAC and Momentus that it was investigating certain disclosures made in filings with the SEC, including in connection with the Business Combination. SRAC and Momentus are fully cooperating with the SEC's investigation and are unable to predict the outcome of the matter at this time."

138.   Following publication of the amended Registration Statement, on March 8, 2021 SRAC's stock closed at $12.50 per share, 8.0% lower as compared to its previous day closing price.

**May 4, 2021 Disclosures Concerning Loss Of Customers**

139.   On May 4, 2021, representatives of SRAC and Momentus participated in a live broadcast interview with IPO Edge.  The interview was accompanied by a modified version of Momentus's investor presentation.

140.   On May 5, 2021, SRAC publicly filed a transcript of this interview with the SEC on Form 425, along with a copy of the accompanying investor presentation.

141.   The investor presentation was similar to presentations previously published by SRAC and Momentus.  However, whereas prior presentations had touted $90 million or $86 million of "backlog" customer contracts, Defendants removed all backlog numbers from this new version of the presentation. The May 4, 2021 presentation contained slides titled "Momentus at a Glance" and "Significant Customer Traction and Expected Demand" that were substantially similar to slides included in prior presentations, with the exception that the prior versions contained specific backlog numbers which were now conspicuously absent from the May 4, 2021 presentation. Also, conspicuously absent from the May 4, 2021 presentation was the inclusion of Lockheed Martin among the lists of customers included in prior presentation versions.

These changes to the investor presentation revealed to the market that Momentus continued to lose customers and backlog. This was a further materialization of concealed risks relating to national security and SRAC's deficient due diligence, and the resulting significant delay in Momentus's planned launch schedule.

142.   Following the broadcast of this interview and presentation, on May 4, 2021 SRAC's stock closed at $11.08 per share, 6.7% lower.

**May 24, 2021 Disclosures Concerning Launch Delays**

143.   On May 24, 2021, SRAC publicly filed with the SEC a current report on Form 8-K.

144.   The current report stated: "On May 23, 2021, Momentus informed Stable Road that it does not expect to fly any missions in 2021 and that this determination was based on information from SpaceX that it was suspending its Momentus-related efforts while Momentus works to secure approvals from the U.S. government . . . Momentus is in the process of updating its financial projections and backlog."

145.   Defendants repeatedly touted participation in multiple planned launches in 2021, even after they admitted to delays in the launch schedule in response to ongoing national security investigations.  Defendants had also promoted SpaceX as a key partner important to Momentus's future plans and success.  However, the risks relating to national security and SRAC's deficient due diligence concealed by Defendants' false statements had further materialized, and Momentus would now not be able to participate in any launches in 2021, and so would not be able to generate any revenue from offering its services in space in 2021.

146.   Also, Defendants had promoted the potential revenue from Momentus's customer order backlog, and aggressive revenue projections based on multiple launches occurring in 2021, but now admitted that these figures required "updating."

**The June 29, 2021 Disclosures**

147.   On June 29, 2021, SRAC publicly filed with the SEC an amended Registration Statement on Form S-4/A.

148.   The amended Registration Statement contained partial corrective disclosures relating to Momentus's unproven technology.  The amended Registration Statement disclosed that "the technology underlying [Momentus's] anticipated service offerings (including its water plasma propulsion technology) is still in the process of being developed and has not been fully tested or validated in space and may never have the capabilities or functionality in space that Momentus currently expects."

149.   The amended Registration Statement admitted that Momentus's sole in space test had not met its objectives and had encountered serious operational problems:

> Our first-generation X-band thruster, which operates at 30 Watts, was flown aboard a demonstration mission called El Camino Real in mid- 2019. During this mission, Momentus launched its first MET into space as a hosted payload on a nanosatellite. The mission's objective was to demonstrate the MET's ability to produce water plasma in space by performing 100 one-minute firings. The MET was instrumented with temperature, pressure and RF reflected power sensors to infer the presence of water plasma, which if detected, would indicate that the water propellant was flowing into the thrust chamber and radio frequency energy was being absorbed by the water.

> Failure of the host satellite in November 2019 prematurely terminated the demonstration after only 23 of the planned 100 firings of the thruster had been performed including 12 hot firings with microwave power turned on and 11 cold firings with the microwave turned off.  While a pump issue significantly restricted flow of water into the thruster during nine of the 12 hot firings, preventing plasma generation, the three hot firings that did have water present were found to have produced plasma.

150.   The amended Registration Statement also contained partial corrective disclosures, relating to the federal government's national security concerns surrounding Defendant Kokorich.  For instance, the amended Registration Statement disclosed that:

> On June 8, 2021, CFIUS' review of the joint notice relating to historical acquisitions of interests in Momentus by Mr. Kokorich, his wife, and entities that they control concluded when the Companym entered into a National Security Agreement with Mr. Kokorich, on behalf of himself and Nortrone Finance S.A. (an entity controlled by Mr. Kokorich), Lev Khasis

and Olga Khasis, each in their respective individual capacities and on behalf of Brainyspace LLC (an entity controlled by Olga Khasis), and the U.S. government, represented by the U.S. Departments of Defense and the Treasury (the 'NSA'). In accordance with the NSA, on June 8, 2021, Mr. Kokorich, Nortrone Finance S.A., Lev Khasis and his wife Olga Khasis, and Brainyspace LLC fully divested all the equity interests in Momentus owned or beneficially owned by them by selling such equity interests to Momentus. The NSA also establishes various requirements and restrictions on Momentus in order to protect national security, certain of which may materially and adversely affect the operating results of Momentus due to uncertainty associated with and the cost of compliance with security measures, and limitations on Momentus' control over certain U.S. facilities, contracts, personnel, vendor selection and operations.

151.   The amended Registration Statement revealed that Momentus would have to pay Defendant Kokorich, Lev Khasis, and their affiliates, $50 million in exchange for the repurchase of their interests in Momentus.

152.   The amended Registration Statement revealed that Momentus's National Security Agreement with the U.S. government imposed onerous and expensive requirements on Momentus, including that:

Under the NSA, we are required to hire and pay for the costs of a full time Security Officer who will be responsible for overseeing compliance with the NSA, an independent third-party monitor to monitor compliance with the NSA by the parties to the NSA, as well as an independent third-party auditor to regularly audit our compliance with the NSA. We are also required to establish: (i) a security plan to safeguard protected technical information, systems and facilities; (ii) a board-level Security Committee to oversee the development and implementation of policies and procedures to safeguard protected technical information, systems and facilities and to exercise appropriate oversight and monitoring of Momentus' operations to ensure that the protective measures contained in the NSA are effectively maintained and implemented; (iii) an audit plan; and (iv) a communications plan. We are also required to provide detailed and frequent reports to the third-party monitor. We will incur substantial costs to implement these and other requirements under the NSA, and we expect that substantial personnel time will need to be devoted to implement and comply with these requirements . . . These costs, requirements and restrictions may

materially and adversely affect our operating results.

153.   The amended Registration Statement revealed further delays to Momentus's anticipated launch schedule:

> Our first launch with customers is currently anticipated to occur in June 2022, subject to receipt of licenses and other government approvals and availability of slots on our launch provider's manifests. Prior planned launches were cancelled due to not receiving required licenses and other governmental approvals and other factors, and we can offer no assurances that our first launch will occur in June 2022. And Defendants similarly admitted that "Momentus now anticipates sending its first two Vigoride vehicles into space in June 2022 . . . approximately 18 months later than had been contemplated at the time of our initial merger announcement."

154.   Defendants further admitted in the amended Registration Statement that the national security concerns and resulting delays had led customers to abandon Momentus:

> If we do not receive [government] approvals in a timely manner, our financial condition, results of operations, backlog and prospects will be materially adversely affected. For example, we have experienced erosion in our backlog of $86 million as of March 4, 2021 to $66 million as of June 11, 2021 as customers chose to cancel their contracts with us and seek alternative providers due to delays in our scheduled missions as we await receipt of necessary governmental approvals.

155.   The amended Registration Statement revealed that SRAC and Momentus had amended their merger agreement, to reflect the fact that Momentus was only half as valuable as Defendants had previously represented to public investors:

> On June 29, 2021, SRAC, Momentus and the other parties to the Merger Agreement entered into an amendment to the Merger Agreement to, among other things, reduce the enterprise valuation of Momentus from $1.131 billion to $566.6 million due to regulatory delays which have resulted in delays in the closing of the Business Combination and Momentus' launch schedule. As a result of these delays, Momentus has updated its financial projections.

156.   The amended Registration Statement disclosed dramatic downward revisions to Momentus's prior revenue projections. For instance, Defendants admitted Momentus had no revenue in 2020, projected no revenue for 2021, and projected only $5 million in revenue for 2022, in addition to dramatic downward revisions in all later years as well.  Defendants admitted, "[i]n general, projected revenue and gross profits have shifted forward by 18 months."

157.   The amended Registration Statement admitted that Momentus's revenue projections "are based on assumptions about Momentus' ability to fully develop, test and validate its technology in space, including its water plasma propulsion technology, and assumes that Momentus can obtain the necessary licenses and regulatory approvals from the U.S. government for its missions on a timely basis."

158.   The amended Registration Statement also admitted that "Momentus has incurred significant losses since inception, it expects to incur losses in the future and it may not be able to achieve or maintain profitability."

159.   The amended Registration Statement admitted regarding the ongoing SEC investigation:

> On January 24, 2021, the Company received a subpoena from the Division of Enforcement of the U.S. Securities and Exchange Commission . . . requesting documents regarding the Registration Statement . . . filed by SRAC in connection with the Business Combination. Most recently, the Company has entered into settlement discussions with the Division of Enforcement in an effort to resolve a potential enforcement action.

**The July 13, 2021 SEC Order And SEC Complaint**

160.   On July 13, 2021, the SEC published the SEC Order, publicly filed the SEC Complaint, and issued a related press release.

161.   The SEC Order and the SEC Complaint revealed material additional facts, not previously disclosed, regarding Momentus's unproven technology, Defendant Kokorich's national security risks, and SRAC's deficient due diligence, which corrected Defendants' prior false and misleading statements and omissions.

## **DEFENDANTS FALSE AND MISLEADING STATEMENTS**

## **October 7, 2020 Merger Agreement**

162. On October 7, 2020, Defendants announced the proposed merger between SRAC and Momentus in communications including: (a) a joint press release from SRAC and Momentus, (b) an investor presentation prepared by Momentus and filed with the SEC by SRAC, (c) a conference call with Defendants Kabot and Kokorich participating, the script for which was filed with the SEC by SRAC, and (d) a televised interview with Defendant Kabot on *CNBC*, the transcript of which was filed with the SEC by SRAC. SRAC filed these documents with the SEC as exhibits to current reports signed by Defendant Kabot.

### **National Security Risks**

163. The joint press release from SRAC and Momentus stated: "The Company plans to launch its first Vigoride vehicle in December 2020 with commercial customers and four to five Vigorides in 2021."

164. The investor presentation presented a timeline under the heading "First Mover with Rapid Progress To Date," forecasting four launches by the end of 2021.

165. In the television interview, Defendant Kabot stated regarding Momentus's launch schedule:

> Our first commercial launch will be in December 2020 with SpaceX. We have a pretty full vehicle of satellites to deliver. And then we have a phenomenal launch cadence for 2021 going up with SpaceX in February, June, and December 2021. We actually have one and a half vehicles already booked for December 2021. So pretty aggressive launch cadence with SpaceX.

166. The conference call quotes Defendant Kokorich as saying: "I am the Founder and CEO of Momentus . . . We are a first mover in offering space transportation and infrastructure services, powered by our groundbreaking water plasma propulsion technology." The conference call script further quotes Defendant Kokorich as saying that Momentus "will be conducting our first flight with customers in December 2020."

167.   The joint press release from SRAC and Momentus quoted Defendant Kokorich as stating: "Momentus is at the forefront of the new space economy and is poised to capitalize on the significant growth opportunity as a first mover."  The press release further quoted Defendant Kokorich as stating: "[w]e expect to deploy the proceeds of this transaction to support our rapid growth and operations, and to support our capital needs as we ramp up revenues."

168.   The joint press release from SRAC and Momentus quoted Defendant Kabot as stating: "As the only public, pure-play commercial space company capable of revolutionizing space infrastructure, Momentus is poised to capitalize on its market-defining position."

169.   The investor presentation stated: "Exceptional Team Led By Visionary Founder," featuring a picture of Defendant Kokorich, who it described as a "Visionary space entrepreneur and innovator," and who it identified as Momentus's CEO and founder. The presentation also stated under the heading "Momentus Opportunity," "Well-seasoned team with experience in aerospace, propulsion and robotics piloted by visionary leader and innovator," in reference to Defendant Kokorich.  The conference call script quotes Defendant Kabot as stating: "[w]ith its visionary founder, highly experienced management team, progress to date and significant commercial traction, Momentus is set to revolutionize and enable the future of the space economy."

170.   The statements above were false and/or misleading when made because they failed to disclose, among other things, the national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

171.   Further, the statements of SRAC and Defendant Kabot above were false and/or misleading because they failed to disclose, among other things, SRAC's failure to

1  perform adequate due diligence on Momentus.  Because SRAC and Defendant Kabot

2  had not performed adequate due diligence on Kokorich's national security risks, their

3  statements regarding his continued involvement with Momentus and regarding

4  Momentus's planned launch schedule lacked any reasonable basis and so were

5  materially misleading.

6  **Momentus's Technology**

7  172.   The investor presentation under the heading "Company Overview," stated:

8  "Groundbreaking water propulsion technology that significantly reduces costs and is

9  reusable," and "Successfully tested water-based propulsion technology on a demo flight

10  launched mid-2019 – is still operational today."

11  173.   In the television interview, Defendant Kabot stated: "we had a very

12  successful test launch, the vehicle is still flying around in space, which is great." 200.

13  The joint press release from SRAC and Momentus stated "Momentus offers its

14  customers significantly more affordable access to space by combining the capabilities of

15  low-cost launch vehicles and Momentus' transport and service vehicles, powered by

16  water plasma propulsion technology . . .  In 2019, the Company successfully tested its

17  water plasma propulsion technology in space."

18  174.   The investor presentation presented a timeline under the heading "First

19  Mover with Rapid Progress To Date," reflecting the "El Camino test flight" in 2019.

20  175.   The investor presentation presented a slide titled "Cornerstone Water

21  Propulsion Innovation" which stated: "High ISP . . . 2 to 5 times any chemical

22  propulsion system" and "High thrust . . . 10 times higher than most electric propulsion."

23  176.   The joint press release from SRAC and Momentus quoted Defendant

24  Kokorich as stating: "The technologies we've developed or built upon, including our

25  groundbreaking water plasma propulsion, will support growing demand from the

26  booming satellite industry with affordable, versatile and low risk transportation and

27  infrastructure services."

28  177.   The conference call quotes Defendant Kokorich as stating: "We are

building upon last year's successful in-space test of our water plasma propulsion and will be conducting our first flight with customers in December 2020." The script also quotes Defendant Kokorich as stating: "We are a first mover in offering space transportation and infrastructure services, powered by our groundbreaking water plasma propulsion technology." The script further quotes Defendant Kokorich stating:

> At the heart of our vehicles is our groundbreaking water plasma propulsion technology, which uses simple water as a propellant. Our system was designed to be safe, inexpensive and offer an excellent mix of thrust and efficiency. Our thruster is more efficient than conventional chemical propulsion and has higher thrust than electric propulsion, such as Hall-effect thrusters.

178. The statements above were false and/or misleading because they failed to disclose, among other things, Momentus's in space test failure. These undisclosed adverse facts directly contradicted Defendants' claims to have successfully tested Momentus's technology in space and rendered Defendants' statements about the properties and commercial readiness of this technology materially misleading.

179. Further, the statements of SRAC and Defendant Kabot above were false and/or misleading because they failed to disclose, among other things, SRAC's failure to perform adequate due diligence on Momentus. Because SRAC and Defendant Kabot had not performed adequate due diligence on the El Camino Real mission, their statements regarding the results of this mission and the commercial readiness of Momentus's technology lacked any reasonable basis and so were misleading.

**Financial Projections**

180. The investor presentation stated under the heading "Transaction Highlights," "No additional capital needs expected prior to achieving profitability."

181. The joint press release from SRAC and Momentus stated: "As of September 30, 2020, the Company had customer contracts which represent approximately $90 million in potential revenue over the next several years."

182. The investor presentation contained a slide titled "Significant Customer

Traction and Expected Demand," which stated: "Signed Contracts >$90M."

183.   In the television interview, the interviewer asked: "I read that the company has contracts for $90 million in potential revenue – I should not, potential – over the next several of years, what kind of risk is involved in those kind of forecasts?" Defendant Kabot responded: "That $90 million is fully contracted and then a portion are options that are written into the agreements."

184.   The joint press release from SRAC and Momentus stated "Combined company will have an estimated enterprise value of approximately $1.2 billion"

185.   The conference call script quotes Defendant Kokorich: "we believe that our financial projections assume a conservative market capture" and also states:

> Commercially, we have seen strong market traction. Our customers include defense primes such as Lockheed Martin, government agencies such as NASA, and dozens of small satellite manufacturers and operators. Our backlog encompasses the initial and early deployment of our customers' constellations, and we expect our backlog with existing customers will grow by many multiples as we plan to serve the rollout of our customers' constellations. We have several substantial opportunities currently in negotiation or in discussions, worth more than $1 billion of additional potential revenue.

> We expect good margin expansion over the next few years and we are projecting that we will be profitable by 2023 and operating at or near run-rate margins by 2025. On a run rate basis, we expect gross margins of around 70%, and EBITDA margins of 60%.

186.   The statements above were false and/or misleading when made because they failed to disclose, among other things, Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable and made it highly unlikely that these projections and related metrics would be achieved.

187.   Further, the statements of SRAC and Defendant Kabot above were false and/or misleading when made because they failed to disclose, among other things, SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and

Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were misleading.

**Due Diligence**

188.   In the television interview, the interviewer asked: "Speaking of SPACs right, I came into this segment saying blank check bonanza, SPAC-a-palooza . . . I'm wondering what you make of it and whether you think there's just too many." Defendant Kabot stated:

> I think it's very healthy, right . . . And what I think is great for the investor is we did four months of due diligence. We spent a lot of money with some of the top service providers out there from Stellar Solutions to Kirkland and Ellis, from Orrick to Evercore to cantor completing our underwriting, right, we did four months of due diligence, which in a traditional ipo you would never have the opportunity to do, so I think SPACs are very healthy for the market.

189.   The statements of SRAC and Defendant Kabot above were false and/or misleading when made because they failed to disclose, among other things, SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and Defendant Kabot had not performed adequate due diligence on Momentus, their statements touting their due diligence process were misleading.

**October 13, 2020 Updated Investor Presentation**

190.   On October 13, 2020, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained as an exhibit an updated version of the investor presentation filed by SRAC on October 7, 2020.

191.   The false and misleading statements and omissions contained in this updated investor presentation were identical or substantially similar to the false and misleading statements and omissions contained in the previously published investor

presentation.

**November 2, 2020 Registration Statement**

192.   On November 2, 2020, SRAC filed a registration statement on Form S-4 with the SEC seeking shareholder approval of the merger.  The registration statement was signed by Defendants Kabot and Norris, and by each member of SRAC's board of directors including Defendant Hofmockel. The registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.

**National Security Risks**

193.   The registration statement stated that "[u]pon the consummation of the Business Combination, the Company's co-founder, Mr. Kokorich, will serve as Chief Executive Officer and a director of the Combined Company." The registration statement also stated: "[w]e believe Mikhail Kokorich will play a vital role in helping us achieve our goals and advance the interests of our stockholders," and that "[w]e believe that Mr. Kokorich is qualified to serve as a member of the board of directors of the Combined Company because of his extensive professional experience in the space technology industry and deep knowledge of the operations of Momentus as our Chief Executive Officer."

194.   The registration statement stated that "[w]e plan to launch the first iteration of our pioneer transport vehicle, Vigoride, in December 2020, followed by five vehicles in 2021. All of our flights, beginning in December 2020, will have paying customers onboard."  The registration statement also stated that "Vigoride's first commercial mission is planned to launch in December 2020, followed by launches in April 2021, June 2021, and December 2021."

195.   The registration statement stated that: "restrictions on the ability of foreign persons to invest in us could limit our ability to engage in strategic transactions that could benefit our stockholders."

196.   The registration statement stated that "it is possible that Mr. Kokorich's

controlling interests in the Company, or perceptions surrounding Mr. Khasis and his affiliation with Sberbank, could make it more difficult to obtain CFIUS approval in connection with future potential investments by the Company in U.S. businesses."

197.   The registration statement also stated that:

> With respect to any investment by Momentus that is within CFIUS's jurisdiction . . . CFIUS could block the consummation of an acquisition or investment within its jurisdiction or could order divestiture after the transaction is completed. Recently, a number of stockholders of a U.S. company, including Mr. Kokorich, divested their interests in such company pursuant to an order by CFIUS.

198.   Regarding Momentus's application to the BIS for an export license to provide its technology to Defendant Kokorich, the registration statement stated that:

> We have been pursuing a BIS license since early 2018 to authorize the deemed export of the Company's controlled technology to Mr. Kokorich, but we have not yet been able to obtain such a license, and there is no assurance we will ever be able to obtain such a license in the future. If we continue to operate without such a license, Mr. Kokorich will continue to be unable to access this controlled technology for as long as he remains a non-US person. While we believe that if the current restrictions on Mr. Kokorich's access to controlled technology remain in place, we will be able to continue to operate our business without any material adverse impact on us, it is possible that these restrictions could in the future lead to complications or other issues that may have a material adverse impact on our operations.

199.   Regarding Defendant Kokorich's immigration status, the registration statement stated that:

> Momentus' co-founder and Chief Executive Officer, Mikhail Kokorich, who will be the Chief Executive Officer of the Combined Company, is a citizen of the Russian Federation who is seeking asylum in the United States and is authorized to work in the United States while his asylum application is pending. While Momentus believes Mr. Kokorich's application will be granted, if for any reason it is not, he may not be able to remain in the United States, which could make it difficult for him to perform his duties as Chief Executive Officer and as a director of the

Company and the Combined Company, which would adversely impact us.

200.   The statements above were false and/or misleading when made because they failed to disclose, among other things, the national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

201.   Further, the statements above were false and/or misleading when made because the risk warnings presented as mere hypothetical risks adverse events that had already materialized; and the risk warnings failed to disclose specific facts concerning regulatory actions involving Defendant Kokorich.

202.   Further, the statements of SRAC and the SRAC Individual Defendants above were materially false and/or misleading when made because they failed to disclose, among other things, SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were materially misleading.

**Momentus's Technology**

203.   The registration statement stated that: "Momentus has developed a portfolio of technologies, including its cornerstone water plasma propulsion technology, which it successfully tested in space in 2019."

204.   The registration statement stated that: "[o]ur revolutionary water plasma propulsion technology provides a unique competitive advantage for our vehicles and services" and that "[w]e view this technology as ground-breaking, as it can achieve

considerable propulsive thrust level while maintaining high ISP, which enables a shorter duration of missions, an enhanced reach, and excellent payload mass ratio."

205.   The registration statement reproduced a slide from the SRAC/Momentus investor presentations previously published on October 7, 2020 and October 13, 2020, which slide was titled "Cornerstone Water Propulsion Innovation," and which stated "High ISP . . . 2 to 5 times any chemical propulsion system" and "High thrust . . . 10 times higher than most electric propulsion."

206.   The registration statement, under the heading "Competitive Advantage Overview," stated:

> A key space-specific barrier to entry is flight heritage. Ultimately the only way to assess the reliability of a product, such as satellites or launch services, is by seeing a history of successful results, which in turn influences insurance rates and customers' perceptions. Therefore, we believe that our status as a first mover will offer a substantial competitive advantage as we continue to build flight heritage ahead of competitors.

207.   The statements above were materially false and/or misleading when made because they failed to disclose, among other things, Momentus's in space test failure. These undisclosed adverse facts directly contradicted Defendants' claims to have successfully tested Momentus's technology in space and rendered Defendants' statements about the properties and commercial readiness of this technology materially misleading.

208.   Further, the statements of SRAC and the SRAC Individual Defendants above were materially false and/or misleading when made because they failed to disclose, among other things, SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on the El Camino Real mission, their statements regarding the results of this mission and the commercial readiness of Momentus's technology lacked any reasonable basis and so were misleading.

**Financial Projections**

209.   The registration statement stated that: "The Combined Company will have an anticipated initial enterprise value of $1.2 billion, implying a 1.0x multiple of 2025 projected EBITDA as Momentus' operations are expected to achieve scale."

210.   The registration statement stated that: "we have received significant interest from a wide range of different customers across different satellite applications. Our current signed backlog (as of November 1, 2020) is worth approximately $90 million in potential revenue and continues to increase, while our pipeline consists of approximately $1.1 billion in potential contracts in negotiation or early conversations."

211.   The registration statement contained the following revenue projections:

| *Management Forecasted Financials[1]* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *($ in millions)* | **2020E** | **2021E** | **2022E** | **2023E** | **2024E** | **2025E** | **2026E** | **2027E** |
| Satellite Transportation Services[1] | $ 2 | $ 19 | $ 122 | $ 435 | $ 852 | $ 1,089 | $ 1,453 | $ 1,717 |
| Satellite as a Service[1] | — | — | 30 | 153 | 319 | 721 | 1,192 | 1,650 |
| In-Orbit Services[1] | — | — | — | 10 | 29 | 150 | 343 | 669 |
| **Revenue**[1] | **$ 2** | **$ 19** | **$ 152** | **$ 598** | **$ 1,200** | **$ 1,960** | **$ 2,987** | **$ 4,035** |
| (%) Growth | NM | 809% | 718% | 293% | 101% | 63% | 52% | 35% |

212.   The registration statement claimed that "in the view of Momentus' management," these projections "reflect[] to the best of management's knowledge and reasonable belief at the time of preparation, the expected course of action and the expected future financial performance of Momentus as of the date of preparation."

213.   The statements above were materially false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding financial projections.  The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable and made it highly unlikely that these projections and related metrics would be achieved.

214.   Further, the statements of SRAC and the SRAC Individual Defendants above were materially false and/or misleading when made because they failed to

disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were materially misleading.

**Due Diligence**

215.   Regarding SRAC's due diligence, the registration statement stated that:

> During the period between the execution of the Confidentiality Agreement and the execution of the Merger Agreement on October 7, 2020, SRAC and its advisors conducted extensive due diligence with respect to Momentus' financial model, customer base and customer contracts, total addressable market, industry in which Momentus operates, companies comparable to Momentus and aero-defense companies with similar characteristics, technology solutions, intellectual property and relationship with SpaceX. Momentus provided representatives of SRAC and its advisors with, among other materials in connection with SRAC's diligence review, confidential presentations reflecting an overview of Momentus' business, as wellm as financial forecasts and written responses to detailed business and financial due diligence questions.

216.   The registration statement also stated that: "[r]epresentatives of each of SRAC and Momentus, as well as each of their advisors, met telephonically several times throughout July, August and September 2020 to discuss disclosure requests and responses in connection with SRAC's diligence review."

217.   The registration statement also stated that: "[o]n September 1, 2020, SRAC engaged Stellar Solutions to assist with technical due diligence, including with respect to Momentus' R&D strategy, vehicle development to date, testing progress and competitive market positioning," and that "[f]rom September 25, 2020 until signing on October 7, 2020, SRAC had multiple teleconferences and email exchanges with representatives of K&E, Stellar Solutions, RSM and certain of its other advisors

regarding the results of their due diligence review of Momentus and any outstanding areas of their due diligence review."

218.   The registration statement stated that in deciding to approve the merger agreement, SRAC's board of directors "considered the scope of the due diligence investigation conducted by SRAC's management and outside advisors and evaluated the results thereof," including "extensive meetings and calls with the Momentus management team," "review of materials related to Momentus made available by Momentus, including . . . export control and security matters," "review of financial due diligence materials prepared by professional advisors," " technical diligence by a third party systems engineering service provider with significant experience in system and subsystem design and propulsion technology," and "discussions with industry experts."

219.   The statements of SRAC and the SRAC Individual Defendants above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Momentus, their statements touting their due diligence process were materially misleading.

**December 14, 2020 Amended Registration Statement**

220.   On December 14, 2020, SRAC also filed an amended registration statement on Form S-4/A with the SEC seeking shareholder approval of the merger.  The amended registration statement was signed by Defendant Kabot and Defendant Norris, and by Defendant Kabot as attorney-in-fact for each member of SRAC's board of directors including Defendant Hofmockel.  The amended registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.  The amended registration statement was substantially similar to the version previously filed by SRAC on November 2, 2020.

221.   The false and misleading statements and omissions contained in this amended registration statement were identical or substantially similar to the false and

misleading statements and omissions contained in the previously published registration statement (with the exception that Momentus's planned inaugural commercial mission was postponed from December 2020 to January 2021).

222.    Further, the December 14, 2020 amended registration statement added new misleading statements regarding Momentus's application to the BIS for an export license to provide its technology to Defendant Kokorich, stating: "notwithstanding the restrictions on Mr. Kokorich's access to export-controlled materials, Momentus has been able to secure contracts with customers ranging from private space companies to established U.S. space industry entities such as NASA and Lockheed Martin."

223.    In discussing Momentus's BIS application, the amended registration statement further stated: "Mr. Kokorich is pursuing several paths to U.S. Person status, and we believe that he meets all of the legal requirements to be granted such status in the United States.  Momentus is also continuing to pursue appropriate export licensure for Mr. Kokorich."

224.    The statements above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained an officer or shareholder, and made it highly unlikely that the federal government would grant Kokorich U.S. Person status.

225.    In addition, the statements of SRAC and the SRAC Individual Defendants above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding his continued involvement with Momentus, whether he would be granted U.S. Person status, and Momentus's regulatory risks lacked any reasonable basis and so were misleading.

**January 4-5, 2021 Press Release And Interviews**

226.    On January 4, 2021, Momentus issued a press release, which SRAC filed with the SEC as an exhibit to a current report on Form 8-K, signed by Defendant Kabot. Also, on January 4, 2021, *IPO Edge* published an interview with Defendant Kennedy, which SRAC filed with the SEC.  On January 5, 2021, *Forbes* published an interview with Defendant Kokorich, which SRAC filed with the SEC.

**National Security Risks**

227.    In the press release, Momentus stated regarding regulatory approvals and its launch schedule that:

> [Momentus] will be remanifesting its January 2021 mission to a subsequent launch opportunity in 2021.  This move will allow for the additional time necessary to secure FAA approval of Momentus' payloads, including completion of a standard interagency review. Momentus currently holds all other necessary licenses for its Vigoride vehicle.   The Company has booked several additional launches with SpaceX between June and December of 2021.

228.    The press release quoted Defendant Kennedy as stating: "We will continue to work with the FAA, as we have done successfully with other regulatory agencies, to obtain approval in a timely manner."

229.    The *IPO Edge* interviewer asked Kennedy: "What caused the delays?", to which Defendant Kennedy replied:

> The most recent shift (from January 2021 to a subsequent launch in 2021) came about as result of a delay in the Federal Aviation Administration's (FAA's) approval of Momentus' spacecraft.  The FAA did not express any specific concerns of its own, but rather indicated that more time was needed to complete its interagency review of Momentus' payload.

230.    The *IPO Edge* interviewer asked: "What is the nature of this interagency review, and is this the first time you are undergoing such a review?" to which Defendant Kennedy replied:

> We are quite familiar with interagency review processes, and we have

cleared similar reviews for our other licenses.  For example, we recently cleared an interagency review as part of our effort to obtain a license from the National Oceanic and Atmospheric Administration (NOAA) to allow the operation of our spacecraft's camera. While we discuss interagency reviews in our S-4, these reviews are a standard part of various license application processes, allowing multiple government agencies – the Department of Commerce, Department of Defense, Department of State, NASA, and others – to examine the applications from their individual perspectives.

231.   The *IPO Edge* interviewer asked: "You state in your S-4 that interagency review may include a review of foreign ownership. Is that a concern for Momentus?" to which Defendant Kennedy replied:

NOAA and its partner agencies have already reviewed Momentus' foreign ownership – this review was completed to the satisfaction of these agencies, as evidenced by NOAA's issuance of a license.

Momentus is approximately 74% U.S.-owned today, and this U.S.-majority ownership is expected to increase to approximately 84% upon the company's merger with Stable Road. This merger is on target to close in the first quarter of 2021 (subject to approval of Stable Road's and Momentus' stockholders and other closing conditions, including a registration statement being declared effective by the SEC). We also mention in our S-4 that Mikhail Kokorich, the CEO of Momentus and one of the company's larger shareholders, is an asylum seeker from the Russian Federation, currently pursuing several paths to U.S. Person status. We believe that Mr. Kokorich meets all legal requirements to be granted such status in the United States, and that he will be offered U.S. citizenship, further increasing U.S. ownership of Momentus.

232.   The IPO Edge interviewer asked: "In addition to the FAA approval, are there any other approvals/licenses Momentus still needs in order to launch Vigoride?" to which Defendant Kennedy replied: "No, Momentus currently holds all necessary licenses for its Vigoride vehicle."

233.   The *Forbes* interviewer asked Kokorich: "Who is your biggest inspiration?"

1   to which Defendant Kokorich replied:

2   My source of inspiration is the story of Igor Sikorsky, a great Russian-
3   American inventor, aviator and entrepreneur. I found a lot of
    commonalities in his life and my own. He became famous and successful
4   in the Russian Empire, where he built the largest plane in the world, and
5   finally ran from the Bolshevik regime of Soviet Russia to the United
    States. He created a large aerospace company and became the inventor of a
6   new class of flying machines: helicopters, the possibility of which was
7   predicted by the great Leonardo Da Vinci.

8   234.   The statements above were false and/or misleading when made because
9   they failed to disclose, among other things, the adverse facts regarding national security
10  risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly
11  likely that the federal government would significantly restrict Momentus's operations so
12  long as Kokorich remained an officer or shareholder, and likewise made it highly
13  unlikely that the federal government would grant Momentus the approvals necessary to
14  achieve its advertised launch schedule.

15  235.   Further, the statements of SRAC and Defendant Kabot above were false
16  and/or misleading when made because they failed to disclose, among other things, the
17  adverse facts regarding SRAC's failure to perform adequate due diligence on
18  Momentus.  Because SRAC and Defendant Kabot had not performed adequate due
19  diligence on Kokorich's national security risks, their statements regarding his continued
20  involvement with Momentus, Momentus's planned launch schedule, and Momentus's
21  regulatory risks lacked any reasonable basis and so were misleading.

22  **Financial Projections**

23  236.   In the press release, Momentus stated that: "The Company reaffirms its
24  expectation of 2021 revenue as detailed in its December 2020 investor presentation."

25  237.   The press release quoted Defendant Kennedy as stating: "We anticipate that
26  by launching our first Vigoride vehicle on a subsequent mission, we will still achieve
27  our revenue expectations for 2021 while delivering our customers' payloads to orbit."

28  238.   The *IPO Edge* interviewer asked Defendant Kennedy: "How will the new

1  launch date impact your 2021 revenue?" to which Defendant Kennedy replied "The

2  number of launches did not change.  Rather than launching in January, we will launch

3  this particular vehicle at our first opportunity, later this year.  Hence, we do not expect

4  changes to our total revenue for 2021."

5       239.   The *Forbes* interviewer asked Kokorich: "Why did you choose the SPAC

6  route to going public? What are the benefits of this versus the traditional IPO route?" to

7  which Defendant Kokorich replied: During the SPAC merger process, a company can

8  communicate its plans and projections to the market, which is challenging to do during

9  the IPO process.  This is especially valuable for fast-growing companies, who place a lot

10 of value in future growth.  Additionally, a company can negotiate and test its valuation

11 during the PIPE process before the deal becomes public and the company goes to

12 market. PIPE is common for SPAC deals, and it also signals to the market that the

13 valuation was negotiated with professional and reputable investors.

14      240.   The statements above were materially false and/or misleading when made

15 because they failed to disclose, among other things, the adverse facts regarding financial

16 projections.  The undisclosed adverse facts regarding Kokorich's national security risks

17 and Momentus's failed in space test made the assumptions underlying the financial

18 projections and related metrics unreasonable, and made it highly unlikely that these

19 projections and related metrics would be achieved.

20      241.   Further, the statements of SRAC and Defendant Kabot above were false

21 and/or misleading when made because they failed to disclose, among other things, the

22 adverse facts regarding SRAC's failure to perform adequate due diligence on

23 Momentus.  Because SRAC and Defendant Kabot had not performed adequate due

24 diligence on Kokorich's national security risks or the El Camino Real mission, their

25 statements regarding financial projections and related metrics for Momentus, which

26 depended on key assumptions regarding Momentus's launch schedule and technology,

27 lacked any reasonable basis and so were misleading.

28

**January 25, 2021 Press Release**

242.   On January 25, 2021, Momentus issued a press release, which SRAC filed with the SEC as an exhibit to a current report on Form 8-K, signed by Defendant Kabot. The press release announced that Momentus's "Board of Directors has appointed Dawn Harms, the Company's Chief Revenue Officer, as a director and interim CEO effective immediately, following the resignation of director and founding CEO Mikhail Kokorich."

243.   The press release stated: "Momentus, in consultation with [SRAC], has determined that accepting Mr. Kokorich's resignation is in the best interest of the Company, in an effort to expedite the resolution of U.S. government national security and foreign ownership concerns surrounding the Company, the existence of which the Company recently has confirmed."

244.   The press release quoted Defendant Kabot as stating: "We believe that this leadership transition will position the company for success and help accelerate regulatory reviews by the U.S. government . . .  We have full confidence in Dawn and the team to lead the Company to reach both near-term targets and achieve even greater success over the longer-term."

245.   The statements above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

246.   Further, the statements of SRAC and Defendant Kabot above were materially false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and Defendant Kabot had not performed

adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were misleading.

**March 8, 2021 Amended Registration Statement**

247.   On March 8, 2021, SRAC filed an amended registration statement on Form S-4/A with the SEC seeking shareholder approval of the merger.   The amended registration statement was signed by Defendant Kabot and Defendant Norris, and by Defendant Kabot as attorney-in-fact for each member of SRAC's board of directors including Defendant Hofmockel.   The amended registration statement incorporated information about Momentus that was supplied to SRAC by Momentus and the Momentus Individual Defendants.

248.   The amended registration statement disclosed regarding Defendant Kokorich's resignation:

> On January 21, 2021, Momentus became aware of correspondence from the U.S. Department of Defense ("DoD") stating Momentus posed a risk to national security as a result of the foreign ownership and control of Momentus by Mikhail Kokorich and Lev Khasis and their associated entities, as well as concerns regarding disclosures relating to such matters made by Stable Road in its SEC filings in connection with the Business Combination. In an effort to expedite the resolution of these U.S. Government concerns, on January 23, 2021, Mr. Kokorich resigned as Momentus' Chief Executive Officer and as a director of Momentus.

249.   The amended registration statement described Kokorich's relinquishment of voting rights in his Momentus stock as part of efforts to overcome the U.S. government's national security concerns:

> As contemplated by the CFIUS notice, on March 1, 2021, each of (i) Mr. Kokorich (and Nortrone Finance S.A. ("Nortrone"), which is wholly owned and controlled by Mr. Kokorich and his wife (collectively, the "Kokorich Parties")), and (ii) Brainyspace LLC ("Brainyspace") (the beneficial owner of which is Olga Khasis, a U.S. citizen and wife of Lev Khasis, a co-founder and former director of Momentus who is a legal

permanent U.S. resident and also a Russian citizen), relinquished their ability to direct the voting of any shares in Momentus through the implementation of trust structures and certain voting arrangements.

250.   The amended registration statement disclosed that Kokorich planned to remain a shareholder of Momentus for several years, stating: "The Kokorich Parties and Brainyspace have agreed with Momentus that they will fully divest their shares by March 1, 2024, or as required by CFIUS."

251.   The amended registration statement discussed Momentus's planned launch schedule, stating: "Vigoride's first two commercial missions are planned to launch in June 2021, followed by a mission in August 2021 and three additional missions in December 2021."

252.   The statements above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

253.   Further, the statements of SRAC and the SRAC Individual Defendants above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and the SRAC Individual Defendants had not performed adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were misleading.

**April 7, 2021 Preliminary Proxy Statement**

254.   On April 7, 2021, SRAC filed with the SEC a current report on Form 8-K, signed by Defendant Kabot, which contained as an exhibit an updated version of the

investor presentations previously published by SRAC and Momentus.  Also, on April 7, 2021, SRAC filed with the SEC a preliminary proxy statement on Form 14A, signed by Defendant Kabot, to postpone its May 13, 2021 deal deadline.

**National Security Risks**

255.   The preliminary proxy statement stated regarding Momentus's efforts to resolve regulatory concerns: "Momentus has undertaken several important actions in an effort to further accelerate the resolution of these concerns," including "The entry into trust structures and certain voting arrangements providing for the complete relinquishment of the ability to direct the voting of shares of Momentus by Mr. Kokorich and Mr. Khasis and/or their associated entities," and "Arrangements providing for the complete divestment of shares of Momentus by Mr. Kokorich and Mr. Khasis and/or their associated entities by March 1, 2024 or as required by CFIUS."

256.   The preliminary proxy statement stated: "Momentus' first launch of customer payloads is currently anticipated to occur in June 2021 on a SpaceX Falcon-9 rocket," and further stated that "Momentus still plans to build and launch six Momentus vehicles in 2021 in three launches."

257.   The investor presentation likewise contained a timeline forecasting Momentus's launch of six Momentus vehicles in 2021 in three launches.

258.   The statements above were materially false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding national security risks pertaining to Defendant Kokorich.  These undisclosed adverse facts made it highly likely that the federal government would significantly restrict Momentus's operations so long as Kokorich remained a shareholder, and likewise made it highly unlikely that the federal government would grant Momentus the approvals necessary to achieve its advertised launch schedule.

259.   Further, the statements of SRAC and Defendant Kabot above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on

Momentus.  Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks, their statements regarding the effect of his resignation, Momentus's planned launch schedule, and Momentus's regulatory risks lacked any reasonable basis and so were misleading.

**Financial Projections**

260.   The investor presentation contained the following revenue projections:



261.   The investor presentation repeated these revenue projections under the heading "Clear Path to Profitability and >$1B in EBITDA.

262.   The investor presentation contained a slide titled "Significant Customer Traction and Expected Demand" which stated "Current Backlog of Potential Revenue ~86M."

263.   The statements above were false and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding financial projections. The undisclosed adverse facts regarding Kokorich's national security risks and Momentus's failed in space test made the assumptions underlying the financial projections and related metrics unreasonable, and made it highly unlikely that these projections and related metrics would be achieved.

264.   Further, the statements of SRAC and Defendant Kabot above were false

and/or misleading when made because they failed to disclose, among other things, the adverse facts regarding SRAC's failure to perform adequate due diligence on Momentus.  Because SRAC and Defendant Kabot had not performed adequate due diligence on Kokorich's national security risks or the El Camino Real mission, their statements regarding financial projections and related metrics for Momentus, which depended on key assumptions regarding Momentus's launch schedule and technology, lacked any reasonable basis and so were misleading.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

265.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

266.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

267.   Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

268.   During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

269.   The Company Board is currently comprised of Defendants Hadfield, Kabot, Kugler, Mercado, Reed, Reiners and Rood.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this

action.

270.   The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.   Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

271.   The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

272.   The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

273.   The Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

274.   The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

275.   Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their fiduciary duties and prosecute this action.  They are in a

position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

276.   Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**MOMENTUS INDIVIDUAL DEFENDANTS ARE NOT INDEPENDENT**

**Defendant Rood**

277.   Defendant Rood is the CEO of the Company.  Defendant Rood is also the Chairman of the Board of the Company.

278.   Defendant Rood is not disinterested or independent, and therefore, is incapable of considering demand because rood (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.  Further, Defendants Kabot, Hadfield and Kugler, as members of the Compensation Committee, determine Defendant Rood's compensation, and Defendant Rood would never consider suing the members of the Compensation Committee – the body that determines his salary.  Moreover, Defendant Rood cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

279.   This lack of independence and financial benefits received by Defendant Rood renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Kabot**

280.   Defendant Kabot made many of the false and misleading statements to the market and thus, could not fairly and fully prosecute such a suit even if he instituted it.

281.   Defendant Kabot was a manager of the Sponsor, shared voting and dispositive control over securities owned by the Sponsor and was reported as

beneficially owning securities owned by the Sponsor.

282.   Defendant Kabot is a defendant in the Securities Class Action.

**Defendants Reiners, Reed and Kugler**

283.   Defendant Reiners is the Chairman of the Audit Committee and Defendants Reed and Kugler are members of the Audit Committee.

284.   Defendants Reiners, Reed and Kugler breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated by the Company as alleged herein, and otherwise failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above.

285.   Based thereon and for other reasons described herein, Defendants Reiners, Reed and Kugler face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### (Against Defendants for Breach of Fiduciary Duties)

286.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

287.   Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

288.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

289.   Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

290.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

291.   As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against Defendants for Gross Mismanagement)

292.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

293.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

294.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

295.   Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

296.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

297.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

298.   As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

299.   The acts and omissions of Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

### FOURTH CAUSE OF ACTION
### (Against Defendants For Unjust Enrichment)

300.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

301.   During the Relevant Period, Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company.  Defendants were unjustly enriched thereby.

302.   To remedy Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

303.   The acts and omissions of Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

### FIFTH CAUSE OF ACTION
### (Against Defendant Kabot for Contribution
### Under Sections 10(b) and 21D of the Exchange Act)

304.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

305.   Stable Road and Defendants Kabot is a named as a defendant in the

72
Derivative Complaint

Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kabot's willful and/or reckless violations of their obligations as officers of Stable Road

306.   Defendant Kabot, because of his positions of control and authority was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

307.   Accordingly, Defendants Kabot is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

308.   As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Kabot.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' breaches of their fiduciary duties;

C.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 20, 2022

**MAGNANIMO DEAN LAW, APC**

By: */s/ Lauren A. Dean*
    LAUREN A. DEAN (SBN 174722)
    5850 Canoga Avenue, Suite 400
    Woodland Hills, CA 91367
    Tel: (818) 305-3450
    Email: lauren@magdeanlaw.com

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
501 Fifth Avenue, 19th Floor
NY, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Counsel for Plaintiff*

74
Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **VERIFICATION**

I, BRIAN LINDSEY, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Stable Road Acquisition Corp. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Stable Road Acquisition Corp. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 09 , 2022.

_____
BRIAN LINDSEY